## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.D, a minor, by her parents and next friends, E.D. and C.D., <br><br> and <br><br> E.D. and C.D., <br><br>     Plaintiffs, <br><br>     v. <br><br> CREATIVE MINDS INTERNATIONAL PUBLIC CHARTER SCHOOL, <br> 3700 North Capitol Street, NW <br> Washington, D.C. 20011, <br><br> and <br><br> DISTRICT OF COLUMBIA <br> OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION, <br> 810 First Street NE, Ninth Floor <br> Washington, D.C. 2002 <br><br>     Defendants. | **Civil Action No.** _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1. This is an action brought by E.D. and C.D. ("the parents"), in their own right and on behalf of their daughter, A.D., alleging that the CMI International Public Charter School ("CMI") and the Office of the State Superintendent of Education ("OSSE"), failed to provide A.D. with the free appropriate public education ("FAPE"), to which she is entitled under the Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§1400 *et seq.* CMI denied this student a FAPE when it failed to propose an appropriate Individualized Education Program ("IEP"), and placement for A.D. for the 2016-17 and 2017-18 school years.

The Hearing Officer who decided the action compounded these violations when he literally ignored the parents' evidence and witnesses, misapplied United States Supreme Court law, and denied the requested relief. The Hearing Officer erroneously concluded that CMI had met its burden of proof of providing a cogent and responsive explanation for its program and placement for A.D. The Hearing Officer also incorrectly found that despite CMI not providing A.D. a FAPE, the parents were not entitled to reimbursement. Accordingly, the Hearing Officer denied the parents their requested relief of funding and placement at the Lab School of Washington ("Lab School"). Due to any of these errors, the Court should reverse the Hearing Officer's Decision.

## Jurisdiction

2. This Court has jurisdiction pursuant to the IDEA, 20 U.S.C. §§ 1400 *et seq*., and 28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

3. Plaintiffs have exhausted their administrative remedies and seek to reverse the order of a Hearing Officer in the Office of Dispute Resolution of the Office of the State Superintendent of Education, case number Case # 2018-0123 (July 27, 2018).

## Parties

4. A.D. is a thirteen-year-old, educationally disabled student who at all times relevant to this action resided in the District of Columbia. Her parents, E.D. and C.D., bring this action on A.D.'s behalf and in their own right.

5. CMI is a District of Columbia public charter school which has elected to be its own local educational agency ("LEA") under the IDEA for special education purposes.

6. OSSE is the state education agency ("SEA") for the District of Columbia.

**Factual Allegations**

7. A.D. is a thirteen-year old student who lives in the District of Columbia and who currently attends the Lab School.

8. A.D. has been diagnosed with dyslexia and a Specific Learning Disability in Written Expression and has been found eligible for special education services as a student with disabilities under the IDEA.

9. A.D. attended Hyde-Addison Elementary School ("Hyde-Addison"), from pre-kindergarten through first grade. While there, she struggled with reading, writing, and spelling and often needed encouragement to participate in small group instruction or classroom activities.

10. Despite each of these difficulties, A.D. received no special education services while at Hyde-Addison, even though her parents had requested academic and cognitive testing.

11. A.D. enrolled at the CMI International Public Charter School ("CMI"), for second grade at the start of the 2012-13 school year.

12. In August 2012, A.D. was assessed by Dr. Jami Temple at CMI's request to determine her cognitive and academic functioning and any disabilities that may be impacting those abilities.

13. Dr. Temple assessed A.D. using the Weschler Intelligence Scale for Children, Fourth Edition ("WISC-IV"), and found that A.D.'s intellectual functioning generally fell into the average range, but her working memory was underdeveloped. Dr. Temple noted that this struggle with working memory would impede her academic progress, especially when multi-step directions were given.

14. Dr. Temple administered the Woodcock Johnson Tests of Achievement, Third Edition ("WJ-III"), and found that A.D. placed in the high average range for broad reading with

strengths in word reading and fluency and in the average range for broad math abilities. However, Dr. Temple found A.D. needed a significant amount of encouragement and prompting to complete math tasks and she had not yet mastered foundational math concepts.

15. A.D. scored in the low range in writing on the WJ-III, well below the expected score based on age and grade level. She was unable to complete the writing fluency subtest because she was unable to independently write complete sentences using three target words.

16. Based on both A.D.'s scores and Dr. Temple's observations, Dr. Temple diagnosed A.D. with a Specific Learning Disability in Written Expression and recommended that she receive special education services. Dr. Temple concluded that A.D. needed a well-structured classroom with small group and one-to-one support available.

17. Dr. Temple's report was submitted to the CMI IEP team and A.D. was found eligible for special education services as a child with a Specific Learning Disability ("SLD").

18. CMI developed an IEP for A.D. but failed to incorporate all of Dr. Temple's recommendations, including goals in the area of written expression.

19. A.D.'s IEP was updated in June 2013, at the end of second grade, and provided two hours of specialized instruction per week outside the general education setting, specifying three goals in written expression.

20. The IEP also stated that A.D. benefitted from specialized and small group instruction both inside and outside the general education setting, but A.D.'s service hours consisted of only two hours per week of specialized instruction outside the general education setting.

21. A.D.'s progress reports over her time at CMI demonstrated that her IEP goals remained largely the same from year to year because she did not accomplish the goals.

22. In the third grade during the 2013-14 school year, A.D.'s IEP included a written expression goal that stated, "when writing words from the 2nd and 3rd grade Dolch list, A.D. will correctly spell the words in 8 out of 10 opportunities." A progress report dated November 11, 2013 stated A.D. was making progress on this goal and she was able to write up to sixty percent of the sight words. However, a progress report dated June 16, 2014, stated that this goal had not yet been introduced. On June 10, 2015 the exact same goal was included in a progress report and her progression on this goal remained unchanged into fifth grade.

23. On February 12, 2015, during an IEP meeting at CMI during A.D.'s fourth grade school year, no additional goals were added to address A.D.'s inability to consistently write second grade words. Two goals were added to the IEP to address her emotional, social and behavioral needs, yet A.D.'s actual service time was reduced to one-and-one-half (1.5) total hours.

24. The February 2015 IEP cut A.D.'s specialized instruction time was in half, down to one hour per week outside the general education setting. No hours were offered in the general education setting, and a mere thirty minutes per week were added for behavioral support services outside the general education setting.

25. The February 12, 2015 IEP stated that, "A.D. benefits from small group instruction both inside and outside of the general education setting," yet it provided no such services other than during the one hour she received specialized instruction each week. No specialized instruction inside the general education setting was provided, despite A.D. spending all but one hour of her school week there.

26. On January 10, 2016, midway through A.D.'s fifth grade year, Dr. Claudia Salazar performed a psychoeducational evaluation of A.D. and found that she continued to have

5

a Specific Learning Disability in the area of writing, but also stated that, "A.D.'s difficulties in her academic work are likely to be impacted by weaknesses in areas of attention control, working memory and processing speed."

27. Dr. Salazar made several recommendations, including the use of writing instruction at a middle-second to middle-third grade level, technology that may make writing tasks easier for A.D. and suggested she be more fully evaluated to determine if she had attention issues or more learning disabilities. Those evaluations were never performed by the school.

28. On February 10, 2016, an IEP meeting was held and much of Dr. Salazar's report was incorporated in the notes section. Goals in the areas of written expression and emotional, social and behavioral development were updated, and goals in the area of reading were added for the first time.

29. However, A.D.'s service hours remained exactly the same, except that thirty minutes of OT consultation service per month were added. Parents had previously made several requests for an OT evaluation and were told it would be scheduled, though it never was. This IEP was the first time OT was addressed at all by CMI. However, the OT services were not actually provided.

30. The February 10, 2016 IEP still provided one hour per week of specialized instruction outside the general education setting, no specialized instruction inside the general education setting, and thirty minutes per week of behavioral support services outside general education.

31. The IEP again stated that A.D. benefitted from small group instruction inside and outside the general education setting, but did not provide for any such instruction other than the

one hour per week of specialized instruction. Progress reports for the year again provided virtually no insight into A.D.'s actual progress.

32. The parents regularly communicated with the staff at CMI about their concerns for A.D. They made it clear that they did not feel her academic needs were being met and that she was growing increasingly frustrated and anxious. The parents also requested increased counseling services to address A.D.'s anxiety, and pointed out work avoidance behaviors and attention issues. Still, A.D.'s services remained unchanged under her IEP and her needs were never adequately or appropriately addressed.

33. In the winter and spring of 2016, A.D.'s parents met with CMI to discuss the transition to middle school, and shared that they were considering other programs.

34. A.D.'s parents began exploring nonpublic special education programs for A.D. in the second semester of fifth grade and asked CMI staff to complete teacher recommendation forms as part of the application process.

35. At the end of March 2016, Lab School accepted A.D. into its program for the upcoming school year.

36. In April 2016, the parents informed CMI that A.D. had been offered a space at Lab School and would not be returning for the 2016-17 school year.

37. At no time in the spring or summer of 2016 did CMI convene an IEP meeting to discuss the parents' concerns or A.D.'s transition to middle school.

38. A.D.'s parents placed her at the Lab School for the 2016-17 school year, provided formal written notice to CMI and OSSE of this placement on August 4, 2016, and reserved their right to seek reimbursement for the tuition paid to the Lab School.

39. On August 8, 2016, Lauren Baum, counsel for CMI, responded to the parents' notice letter and stated that she was working to set up a meeting time to review the parents' change in placement request.

40. On August 17, 2016, Ms. Baum communicated again, stating that because A.D. had been unenrolled from CMI and enrolled at the Lab School, CMI would not be able to move forward with any meetings. Specifically, she stated that OSSE would not allow CMI to move forward with a placement review or a change in placement meeting. For such a meeting to occur, parents would need to reenter the lottery for CMI or enroll at another DCPS school.

41. On September 2, 2016, OSSE's position was reiterated in an email by Zoe Thomas, Assistant General Counsel to OSSE. Ms. Thomas wrote: "OSSE obviously cannot assist an [Local Educational Agency ("LEA")] in locating a nonpublic placement for a student that is not enrolled with the LEA."

42. Ms. Baum then reiterated CMI's and OSSE's positions in a September 8, 2016 email.

43. A.D. began sixth grade in the Intermediate Program at Lab School and immediately began receiving full-time specialized instruction in a self-contained setting, including forty-five minutes weekly of individual psychological services.

44. Lab School developed its own IEP in the fall of 2016, providing her with full-time special education services, individual psychological services, and numerous robust IEP goals to address academic and psychological needs.

45. At Lab School, A.D. received several accommodations including, but not limited to, one-to-one assistance during writing, a scribe, frequent/constant check-ins, a repetitive and

consistent writing process procedure, prompts for attention, visual prompts for math processes, additional processing time, and a multi-sensory approach to learning.

46. In February 2017, the parents hired Amy Mounce, an educational consultant, to provide her opinion and expertise on appropriate programming for A.D.

47. On February 3 and 27, 2017, Ms. Mounce observed A.D. in her writing and math classes at Lab School. In both classes, she observed a low student-to-teacher ratio and an assistant working frequently with A.D. to keep her on task and doing her work.

48. In her writing class, A.D.'s difficulty with the writing process and attentional issues were quite apparent. She was provided scribing and one-to-one assistance, but still required frequent reminders and prompts to focus on the writing assignment.

49. Ms. Mounce spoke with A.D.'s teacher at Lab School and found that this was not a typical day for A.D. because she did "much better" in terms of work production. Her teacher also expressed that A.D. had difficulty with socialization, as she often preferred to read a book rather than interact with peers.

50. During her second observation, Ms. Mounce observed A.D. in her math class and found frequent off-task behavior. In fact, A.D. only remained on task when the assistant sat next to her and provided verbal and nonverbal redirection.

51. In her observation report, Ms. Mounce noted A.D.'s weaknesses in written expression, initiating and maintaining tasks, work completion, materials management, distractibility, following multi-step directions, spelling, self-advocacy, and body awareness.

52. In May 2017, A.D.'s therapist at Lab School, Dr. Lorraine Simon, reported her psychotherapy progress since beginning the Intermediate program at Lab School. Due to past negative experiences at her previous school, Dr. Simon reported that A.D. experienced difficulty

discussing challenging feelings or discomfort, but that she was learning coping strategies to help her manage her feelings.  She continued to recommend individual psychotherapy once per week to focus on expanding coping and problem-solving skills.

53. On May 23, 2017, an IEP meeting was held at Lab School with A.D.'s parents and Ms. Mounce to discuss her progress since the beginning of the school year.  Her teacher, Lauren Miller, reported that A.D. had made some nice gains in all academic areas after a hard adjustment.  At the beginning of the year, it was difficult for her to do any academic writing, but she made significant progress and was now able to structure and write a paragraph.

54. At the Lab School IEP meeting, her parents reported that A.D.'s social/emotional functioning had significantly improved since beginning at Lab.  However, she still needed to work on taking risks and socializing with peers more often.

55. In a Lab School Intermediate End-of-Year Progress Report, A.D.'s teachers reported the areas in which she had improved and areas of weakness that persisted.  Overall, A.D. had a very successful first year at Lab and would transition to the Junior High for seventh grade.

56. On August 7, 2017, without any IEP or placement proposed from CMI, A.D.'s parents again notified CMI and OSSE that A.D. would be placed at the Lab School for her upcoming seventh grade year, and they reserved the right to seek reimbursement.

57. On August 14, 2017, Ms. Thomas once again asserted that OSSE would not enter into a change in placement meeting if A.D. was not enrolled at the public school.

58. This refusal to meet forced the parents to choose between enrolling A.D. in an inappropriate program while the IEP process was still underway or forfeiting all rights under the

10

IDEA and enrolling in an appropriate program, further denying A.D. the FAPE to which she is entitled.

59.   With OSSE's unwillingness to reconvene an IEP meeting and resulting failure to offer A.D. a FAPE, the parents filed a request for a due process hearing on January 3, 2018.

60.   The first day of hearing took place on March 15, 2018 and the parents presented their case which included the testimony of their experts, Amy Mounce, Jessica Lux, and Dr. Doug Fagen, as well as A.D.'s mother. CMI also presented a portion of their case, including testimony of the school director and registrar.

61.   The hearing was set to continue on March 19, 2018, but due to a sudden death in A.D.'s family, needed to be rescheduled. The parties discussed their availability for the second day of hearing and found the first mutually-available date was May 4, 2018.

62.   Due to such a large gap between the first and second days of hearing, the parents requested the hearing transcript of March 15, 2018 from the Office of Dispute Resolution.

63.   On April 25, 2018, the parents were informed by Sharon Courm of the Office of Dispute Resolution that the transcript could not be transcribed. The parents, through counsel, immediately notified the hearing officer and opposing counsel of this development and requested a conference call to discuss the issue.

64.   On May 1, 2018, the parties participated in a teleconference and reluctantly agreed the case needed to start from the beginning due to the apparent absence of a verbatim record and the potential prejudice to the parents. At the suggestion of the hearing officer, the hearing request was withdrawn on May 2, 2018.

65. On May 4, 2018, the parents re-filed their complaint against both CMI and OSSE requesting reimbursement for the 2016-17 and 2017-18 school years, including all related services, and that A.D. be placed at Lab School for the 2018-19 school year.

66. The due process hearing was convened on July 9, 13, and 16, 2018 before Hearing Officer Michael Lazan.

67. At the hearing, the parents again presented testimony from their experts, Amy Mounce, Jessica Lux, the Assistant Head of the Junior High at Lab School, and Dr. Doug Fagen, a Lab psychologist, as well as A.D.'s mother.

68. The parents' witnesses testified to A.D. significant educational and social/emotional needs which impact her throughout the school day.

69. The parents' witnesses all testified to the significant benefit that A.D. is receiving at Lab School.

70. The Hearing Officer issued his Decision on July 27, 2018, granting some and denying some of the parents' requested relief.

71. The Hearing Officer concluded that there was nothing in the record to suggest that A.D.'s services in written language should have been reduced in her February 2016 IEP.

72. The Hearing Officer properly concluded that A.D.'s February 2016 IEP was inappropriate for her, denying her educational benefit and a FAPE.

73. The Hearing Officer improperly dismissed CMI and OSSE's failure to propose any IEP and placement for the 2017-18 school year.

74. The Hearing Officer improperly concluded that A.D.'s LEA for the 2017-18 school year should be District of Columbia Public Schools and not CMI.

75. The Hearing Officer incorrectly concluded that OSSE, as the SEA, had no responsibility to provide A.D. a FAPE for the 2017-18 school year.

76. The Hearing Officer correctly found the CMI did not meet its burden in proving that A.D.'s February 2016 IEP provided her with sufficient specialized instruction and that CMI failed to offer A.D. a FAPE.

77. The Hearing Officer properly concluded that the parents demonstrated that A.D.'s placement at Lab School was proper under the IDEA.

78. The Hearing Officer improperly reduced the parents' tuition reimbursement by fifty percent for the 2016-17 school year, erroneously holding that the parents should have provided CMI with earlier notice of their intent to place A.D. at Lab School and seek reimbursement.

79. The Hearing Officer improperly denied the parents requested relief for the 2017-18 school year.

80. The Hearing Officer's Decision contains multiple errors of fact and law.

81. Many of the Hearing Officer's finds of fact are not regularly made.

82. The Hearing Officer applied incorrect legal standards in reaching his Decision.

83. The parents are aggrieved by the Hearing Officer's Decision.

84. The parents have exhausted their administrative remedies.

## COUNT I

(Failure to provide a Free Appropriate Public Education)

85. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 84.

86. Defendant's failure to provide A.D. with a free appropriate public education violates plaintiffs' rights under the IDEA and District of Columbia law.

## COUNT II

(Failure to Offer Appropriate Program and Placement)

87. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 84.

88. The failure of the Hearing Officer to order defendant to place and fund A.D. in an appropriate program and placement violates the IDEA and District of Columbia law.

## COUNT III

(Failure of the Hearing Officer to Render a Proper Decision)

89. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 84.

90. The Hearing Officer committed error and violated plaintiffs' due process rights under the IDEA and District of Columbia law by failing to render a proper decision based on an accurate and impartial understanding of the facts.

91. The Hearing Officer committed error and violated the plaintiffs' due process rights under the IDEA and District of Columbia law by failing to apply correct legal standards.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1. Issue judgment for plaintiffs and against defendant;

2. Issue declaratory relief that defendant violated plaintiffs' rights under applicable law;

3. Issue injunctive relief, vacating the Decision of the Hearing Officer and ordering defendant to reimburse plaintiffs for the tuition expenses and costs incurred in enrolling

A.D. at The Lab School of Washington from the beginning of the 2016-17 school year through the present;

    4.    Order defendant to place and fund A.D. at the Lab School of Washington and declare it to be her current educational placement under the IDEA;

    5.    Order defendant to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

    6.    Award any other relief that this Court deems just.

Respectfully Submitted,

/s/

| | |
|---|---|
| Michael J. Eig | #912733 |
| Matthew B. Bogin | #911552 |
| Paula A. Rosenstock | #494580 |
| Meghan M. Probert | #1004929 |

MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Plaintiffs