## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **A.D.**, *et al* | |
| Plaintiffs, | |
| v. | Civil Action No. 18-cv-2430 (CRC) (DAR) |
| **Creative Minds International Public Charter School**, *et al* | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, E.D. and C.D., brought this action on behalf of their 13-year-old daughter, A.D., on the grounds that the public charter school A.D. formerly attended failed to provide her the "free appropriate public education" ("FAPE") she is entitled to under the Individuals with Disabilities Education Act ("IDEA"), <u>see</u> 20 U.S.C. §§ 1400 *et seq.* They name as defendants the school, Creative Minds International Public Charter School ("Creative Minds"), and the District of Columbia Office of the State Superintendent of Education ("OSSE").

Before the Court is the Report and Recommendation issued by Magistrate Judge Deborah A. Robinson granting in part Plaintiffs' Motion for Summary Judgment, ECF No. 25, granting in part Creative Minds' Cross-Motion for Summary Judgment, ECF No. 30, and granting OSSE's Cross-Motion for Summary Judgment, ECF No. 28. Creative Minds lodged three objections to the Report and Recommendation, ECF No. 40, ("Def. Objections"), arguing that it provided A.D. a FAPE, that it did not receive adequate notice of A.D.'s removal from the school, and that it was not the proper source of a tuition reimbursement. For the following reasons, the Court overrules each objection and adopts the Magistrate Judge's Report and Recommendation.

I.    **Background**

A.    Statutory Background

The IDEA ensures that all children with disabilities are offered a "free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  The state delivers the IDEA-required FAPE through the provision of an "individualized education program," or "IEP."  See Endrew F. ex. rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017).  The IEP is "[t]he modus operandi of the [IDEA]," Burlington School Committee v. Department of Education, 471 U.S. 359, 368 (1985), and includes "a written statement of a handicapped child's present educational level, future educational goals for the child, future educational services to be provided to him, and the extent to which he will be able to participate in regular educational programs," McKenzie v. Smith, 771 F.2d 1527, 1529 n.2 (D.C. Cir. 1985); see also 20 U.S.C. § 1414(d)(1)(A)(i).

Parents who disagree with their child's IEP are entitled to a due process hearing before a hearing officer.  Id. § 1415(f)(1)(A).  Any party aggrieved by the hearing officer's decision ("HOD") may, in turn, bring a civil challenge to that decision in district court.  Id. § 1415(i)(2)(A).  The party challenging the HOD bears the burden of persuasion.  Reid ex rel. Reid v. District of Columbia, 401 F.3d 516, 521 (D.C. Cir. 2005).

Should the court or hearing officer decide that a child was denied a FAPE, the IDEA entitles parents to reimbursement for private school tuition if the parents made the unilateral decision to transfer their child to a private school.  See Legett v. District of Columbia, 793 F.3d 59, 66–67 (D.C. Cir. 2015).  The court has discretion to reduce or deny that reimbursement, however, if the parents failed to notify the district of their intent to remove the child within "10

business days . . . prior to the removal of the child from the public school."  20 U.S.C.

§ 1412(a)(10)(C)(iii)(I).[1]

The local education agency ("LEA") is the party responsible for providing the child a

FAPE and an IEP.  See Dist. of Columbia v. Vinyard, 971 F. Supp. 2d 103, 111 (D.D.C. 2013)

(the LEA "will offer the child a FAPE, i.e., an IEP"); see also D.C. Mun. Regs. tit. 5-E,

§ 3002.1(a) ("[t]he LEA shall make a free appropriate public education (FAPE) available to each

child with a disability").  Typically, the District of Columbia Public Schools ("DCPS") serves as

the LEA for children enrolled in the District's public schools, public charter schools, and private

schools.  See id. § 3002.1(b).  The exception to this general rule is the "LEA Charter," which, as

opposed to a "District Charter," is a charter school that elected to be its own "independent

[LEA]."  Id. § 3019.2.  A school that elects to be an LEA Charter, as is the case with Creative

Minds, retains responsibility for satisfying the IDEA as to each of its enrolled students with a

disability.  See id. § 3002.1(a) ("For DCPS, the responsibility to make FAPE available extends to

all children with disabilities . . . who are residents of the District of Columbia *but are not*

*enrolled in a public charter school LEA*.") (emphasis added)).

B.  Factual Background

A.D. began attending Creative Minds at the beginning of the 2012-13 school year for

second grade.  A.R. 68, 816.[2]  In August 2012, Creative Minds requested that Dr. Jami Temple

conduct a cognitive and academic assessment of A.D.  Id. at 68–76 (Dr. Temple Report).  Dr.

Temple's assessment revealed, among other things, that A.D.'s working memory was

---

[1] Parents may also satisfy the notice requirement by notifying the IEP Team of their intention to remove the child at the most recent IEP meeting they attended prior to removal.  Id.

[2] Citations to the "A.R." refer to the administrative record.  See Administrative Record by Creative Minds Int'l Pub. Charter School, ECF No. 23.

"significantly underdeveloped," which hindered her "performance in a variety of academic areas," id. at 69, 74. Additionally, Dr. Temple administered Woodcock Johnson Tests of Achievement, Third Edition ("WJ-III"), on which A.D. scored in the "average" range for "broad math" but in the "low" range for "math fluency." Id. at 72. Finally, Dr. Temple observed that A.D. "lack[ed] confidence in her math skills due to limited mastery of foundational math," id. at 73, and had a Specific Learning Disability in written expression, id. at 74.

Following Dr. Temple's report, Creative Minds determined that A.D. was eligible for special education services and assembled a team to develop her IEP. See id. at 86. As required under the IDEA, the IEP set measurable, academic goals for A.D. and laid out the specialized services she would be provided in order to achieve those goals. See id. at 90 (August 2012 IEP Progress Report). Over the next four years at Creative Minds, A.D.'s IEP was periodically updated to reflect her progress, set new goals, and adjust the specialized services that she would be provided. See id. at 497.

In February 2015, Plaintiffs contacted Creative Minds indicating their desire to update A.D.'s IEP. See id. at 122. Plaintiffs specifically noted that A.D. had not achieved her IEP goals or developed her writing skills, and requested a "team meeting to strategize how to assist [A.D.]," which "may include reevaluating [A.D.'s] IEP objectives." Id. A.D., who was in the fourth grade at the time, hadn't achieved any IEP goals since her second-grade year. Id. at 497.

In January 2016, a psychoeducational evaluation of A.D. was completed by Dr. Claudia Salazar at Creative Minds' request. See id. at 178–90 (Dr. Salazar Report). Dr. Salazar's report revealed that A.D. retained her Specific Learning Disability in written expression and had difficulties with attention control, memory, and processing speed. See id. Additionally, the evaluation revealed that A.D. scored "low average" in broad mathematics and "low" in math facts

4

fluency.  Id. at 185.  About one month later, Creative Minds convened an IEP team, resulting in an IEP that contained no math goals and reduced A.D.'s specialized instruction in written expression by thirty minutes per week.  Id. at 131–35, 240, 1051.

In the winter and spring of 2016, Plaintiffs began conveying to Creative Minds that they were considering other options for A.D. for the following school year.  See id. 174–75, 426, 429–30.  In March 2016, A.D. was accepted into the Lab School of Washington for the 2016-17 year.  Id. at 819, 1062–63.  In April 2016, Plaintiffs notified Creative Minds that A.D. would not be returning for the following year.  Id.  On August 4, 2016, Plaintiffs provided formal notification to Creative Minds and OSSE that they intended to seek public reimbursement for A.D.'s tuition at the Lab School, which is private.  Id. at 247–48.

C.  Procedural Background

In July 2018, Plaintiffs received a due process hearing pursuant to the IDEA.  See id. at 814.  The Hearing Officer held over three days of hearings before ultimately issuing a 22-page decision ("HOD") that surveyed the relevant evidence and testimony and made thirty findings of fact.  See id. at 812–35 (HOD).  As relevant here, the Hearing Officer concluded: (1) that Creative Minds' February 2016 IEP failed to provide A.D. a FAPE, and (2) that Plaintiffs were entitled to a reduced reimbursement for the 2016-17 school year.  Id. at 827, 833.  The Hearing Officer ordered Creative Minds to provide that reimbursement.  Id.

As to the first conclusion, the Hearing Officer faulted Creative Minds for not providing A.D. "any assistance in math" in the IEP, "[d]espite [her] relatively low levels in math facts fluency . . . , which resulted in [Plaintiffs] having to get a math tutor for their child after school."  Id. at 826.  "Moreover, and of particular importance," the Hearing Officer observed that the IEP "provided a minimal amount of assistance in writing."  Id.  In fact, the February 2016 IEP

reduced A.D.'s "specialized instruction in writing," despite there being "nothing in the record" to support this reduction and ample evidence to the contrary.  Id. at 826–27 (citing to, among other things, A.D.'s January 2016 Woodcock-Johnson test scores).

As to the second conclusion, the Hearing Officer found that A.D. was entitled to tuition reimbursement for her sixth-grade year at the Lab School.  See id. at 830–33.  However, the Hearing Officer reduced that reimbursement by half due to his conclusion that Plaintiffs failed to provide Creative Minds proper notice under 20 U.S.C. § 1412(a)(10)(C)(iii).  According to the Hearing Officer, Plaintiffs violated the IDEA's notice requirement by signing an enrollment agreement with the Lab School before formally notifying Creative Minds of their intent to remove her.  A.R. 833.

Plaintiffs filed a complaint in this Court against Creative Minds and OSSE alleging, among other things, that the HOD erroneously reduced their tuition reimbursement.  See Complaint, ECF No. 1.  The case was referred to United States Magistrate Judge Deborah A. Robinson on October 30, 2018.  All parties moved for summary judgment.  See Mot. for Summ. J. by A.D., C.D., E.D., ECF No. 25; Cross-Mot. for Summ. J. by OSSE, ECF No. 28; Cross-Mot. for Summ. J. by Creative Minds, ECF No. 30.

As relevant here, Plaintiffs argued that they were entitled to a full tuition reimbursement because they did, in fact, provide Creative Minds adequate notice under the IDEA.  See Mot for Summ. J. by A.D at 24–27.  Creative Minds responded that the Hearing Officer erred in determining that it failed to provide A.D. a FAPE via the February 2016 IEP.  Cross-Mot for Summ. J. by Creative Minds at 29–37.  And regardless, Creative Minds reasoned, Plaintiffs should be denied any reimbursement because they violated the IDEA notice requirement.  Id. at 39–45.  Finally, OSSE argued that as an agency of the District that is subordinate to the mayor, it

is *non sui juris* and that, regardless, Creative Minds—not OSSE—was responsible for providing A.D. a FAPE during the relevant time period.  See Cross-Mot. for Summ. J. by OSSE at 9–11.

On August 14, 2020, the Magistrate Judge issued a Report and Recommendation.  See Report and Recommendation, ECF No. 37.  As relevant here, the report agreed with the HOD's conclusion that Creative Minds deprived A.D. of a FAPE for the 2016-17 school year.  See id. at 35–40.  The report disagreed with the HOD, however, as it pertained to the tuition reimbursement.  See id. at 40–45.  Unlike the Hearing Officer, the Magistrate Judge concluded that Plaintiffs should be fully reimbursed for A.D.'s private-school tuition because they did not, in fact, violate the notice requirement.  Finally, the Magistrate Judge determined that OSSE was *non sui juris* because it is a government agency not subject to suit absent explicit statutory permission.  See id. at 48–49.

Creative Minds was the only party to object to the Report and Recommendation.  See Def. Creative Minds Objection to Report and Recommendations, ECF No. 40, ("Objections"). In the objections, Creative Minds contends that Plaintiffs should be denied any reimbursement because A.D. received a FAPE and, regardless, Plaintiffs failed to provide Creative Minds adequate notice of A.D.'s removal.  See id. at 1–18.  Finally, Creative Minds argues that even if Plaintiffs were entitled to reimbursement, it is the responsibility of OSSE—not Creative Minds—to provide it.  See id. at 19–20.

## II.    Standard of Review

When reviewing the HOD, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as [it] deems appropriate." 20 U.S.C. § 1415(i)(2)(C).  The reviewing court "must give 'due weight' to the HOD and 'may

not substitute its own notions of sound educational policy for those of the school authorities.'"

Turner v. District of Columbia, 952 F. Supp. 2d 31, 35–36 (D.D.C. 2013) (quoting S.S. v.

Howard Rd. Acad., 585 F. Supp. 2d 56, 63 (D.D.C. 2008)). That being said, the IDEA calls for

"less deference than is conventional in administrative proceedings," and "a hearing decision

without reasoned and specific findings deserves little deference." Reid, 401 F.3d at 521 (internal

quotations omitted). At bottom, the party appealing a Hearing Officer's finding must convince

the court "that the hearing officer was wrong." Id.

## III.    Discussion

As stated, Creative Minds objects to the Report and Recommendation on three bases. It

argues that the Magistrate Judge erred by: (1) determining that the February 2016 IEP was

inadequate under the IDEA; (2) concluding that Plaintiffs complied with the notice provisions of

the IDEA and are thereby entitled to tuition reimbursement; and (3) ordering Creative Minds,

rather than OSSE, to pay the reimbursement.

Before addressing each objection, the Court notes that while "little deference" is afforded

to "a hearing decision without reasoned and specific findings," Reid, 401 F.3d at 521, the HOD

at issue here cannot be so described. Following over three days of hearings and testimony by

several witnesses, the Hearing Officer issued a 22-page decision that discussed the relevant

evidence, made thirty specific findings of fact, and rendered two conclusions of law that were

explained in considerable detail. Compare A.R. 812–34 (HOD) with Reid, 401 F.3d at 521

(providing little deference to hearing officer conclusion that "contain[ed] neither reasoning . . .

nor factual findings" in support). With this in mind, the Court turns to the objections lodged by

Creative Minds.

A.  Objection I

First, Creative Minds maintains that the Hearing Officer's conclusion that the February 2016 IEP was inadequate is unsupported by the record.  In particular, Creative Minds argues that the Magistrate Judge overlooked evidence of A.D.'s progress during the 2016–17 school year and relied on isolated pieces of unconvincing evidence.  See Creative Minds Obj. 2–12.  The Court disagrees.

The IDEA requires that an IEP be "'*specially* designed' to meet a child's '*unique* needs.'"  Endrew F., 137 S. Ct. at 999 (quoting 20 U.S.C. § 1401(29), (14)) (emphasis in original).  The Supreme Court has construed this requirement to mean that the IEP must be "reasonably calculated to enable the child to make progress appropriate in light of the child's circumstances."  Id. at 1002.  While there's no "formula" for determining whether this "general standard" is met, it "is markedly more demanding than [a] merely more than *de minimis* test."  Id. at 1000 (internal quotation marks omitted).  After all, "a student offered an educational program providing merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all."  Id. at 1001 (internal quotation marks omitted).

Here, ample evidence supports the Hearing Officer's conclusion that the February 2016 IEP failed to satisfy this standard.  In particular, the record reflects that shortly before the February 2016 IEP team convened, A.D. had demonstrated significant educational deficiencies in writing and math.  And yet, A.D.'s IEP team omitted any math goal and reduced her specialized instruction in written expression by thirty minutes per week.  Due to these omissions, it cannot be said that A.D.'s IEP was reasonably calculated to enable her success in light of her unique needs.

Turning first to the Hearing Officer's conclusion that the February 2016 IEP should have contained a math goal.  For starters, just one month prior to the February 2016 IEP, Dr. Salazar conducted a psychoeducational evaluation of A.D. at Creative Mind's request.  See A.R. 178–90 (Dr. Salazar Report).  That report revealed that A.D. scored "low" and "low average" in math facts fluency and broad math, respectively, on a nationally standardized test.  Id. at 185.  And one year prior to that, A.D.'s 2015 IEP noted that A.D. "become[s] easily anxious and frustrated with classroom demands, specifically math."  Id. at 133.  Indeed, A.D.'s difficulties with math had been on Creative Minds' radar since she started school there in the second grade.  In 2012, A.D. underwent another psychoeducational evaluation at Creative Minds' request.  See id. at 68. In that evaluation, performed by Dr. Temple, A.D. took nationally standardized tests and, again, scored "low" in math fluency.  Id. at 72.  Dr. Temple noted that A.D. "was only able to correctly solve a few very simple math addition and subtraction computations," "appear[ed] to lack confidence in her math skills due to limited mastery of foundational math concepts," and "would likely benefit from specialized instruction in this area."  Id. at 73.

Turning next to the reduction in A.D.'s specialized instruction in written expression, the Court again finds ample evidence to support the Hearing Officer's conclusion that the reduction was in error.  A.D. was diagnosed with a Specific Learning Disability in written expression in her first year at Creative Minds.  Id. at 75.  Then in January 2016, Dr. Salazar determined that A.D. retained a Specific Learning Disability in writing, with a particular difficulty in spelling. Id. at 188.  Dr. Salazar noted that A.D.'s "limit[ed] spelling skills are interfering with her ability to writ[e] fluently and in a way that is easy to understand."  Id. at 178.

Further, Dr. Salazar noted that on a nationally standardized test, A.D. scored "low average" in broad written language and "low" in spelling.  Id. at 186.  And nine months prior to

Dr. Salazar's report, an "Analysis of Existing Data" form completed by Creative Minds specifically noted that A.D. had "the most difficulty with spelling and sentence writing" and was unable "to write a complete sentence using three target words." Id. at 526.  Finally, by February 2016, A.D. had been unable to achieve *any* of her IEP goals for the past three consecutive years at Creative Minds.  See id. 497.  The decision to reduce A.D.'s time for specialized instruction, then, is puzzling.

In sum, Creative Minds has failed to convince the Court that the Hearing Officer "was wrong" to find the February 2016 IEP inappropriate under the IDEA.  See Reid, 401 F.3d at 521. "An IEP is not a form document," but rather, "is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." Endrew F., 137 S. Ct. at 999.  Despite A.D.'s proven difficulties in math and writing, as well as her inability to achieve any IEP goals for the past three years, the February 2016 IEP contained no math goals and reduced A.D.'s weekly time for specialized instruction in writing.  Those facts clearly support the Hearing Officer's determination that the plan was not reasonably calculated to enable A.D.'s academic success and, as such, violated her rights under the IDEA.

    B.  Objection II

Next, Creative Minds argues that, regardless of whether A.D. received a FAPE, Plaintiffs should be denied any reimbursement under the IDEA because they violated the Act's notice requirements.  Again, the Court disagrees.

Parents of a child who has been denied a FAPE are entitled to a tuition reimbursement for the cost of enrolling their child in private school.  See 20 U.S.C. § 1412(a)(10)(C)(ii).  In the court's discretion, however, the reimbursement may be reduced or denied if the parents failed to provide the school the notice required under the IDEA or "otherwise act[ed] unreasonably."

Legett v. District of Columbia, 793 F.3d 59, 66–67 (D.C. Cir. 2015) (cleaned up).  Parents satisfy the IDEA's notice requirement if they "stat[e] their concerns and their intent to enroll their child in a private school at public expense" at least "10 business days . . . prior to the removal of the child from the public school." 20 U.S.C. § 1412(a)(10)(C)(iii)(I).[3]

Here, the Magistrate Judge concluded that Plaintiffs complied with the notice requirement by providing such notice on August 4, which was at least ten days prior to the date A.D. was physically removed from Creative Minds.  Creative Minds disagrees, arguing that Plaintiffs had to provide notice to Creative Minds at least ten days prior to signing the enrollment agreement with the Lab School, which occurred in March.  Thus, in Creative Minds' view, Plaintiffs missed the deadline to provide timely notice by approximately five months.

Creative Minds' dispute with the Report and Recommendation concerns the meaning of "removal" under § 1412(a)(10)(C)(iii)(I).  No binding precedent appears to define "removal" in this context.  However, the District Court of Maryland addressed this issue in Sarah M. v. Weast, 111 F. Supp. 2d 695, 701–02 (D. Md. 2000).  In Weast, the court construed "removal" as requiring "*actual physical* removal from public school," such that merely signing an enrollment agreement did not suffice.  Id. at 701 (emphasis added); see also Reg'l Sch. Unit 51 v. Doe, 920 F. Supp. 2d 168, 212 & n.15 (D. Me. 2013) (adopting the Weast standard); 3 Americans with Disabilities: Practice & Compliance Manual § 11:116 (same).

---

[3] Parents may also provide this information at "the most recent IEP meeting that the parents attended prior to removal."  Id.  Plaintiffs did not provide such notice at the relevant IEP meeting, claiming that they were unaware that they'd be removing A.D. at that time.  See Pl. Mot. Summ. J. at 24.

The <u>Weast</u> court based its interpretation of the term on "ordinary parlance," in which

"'remove' bespeaks a physical action and would seem . . . to suggest a *present* and not a *future*

action." <u>Id.</u> at 700 (emphases added).  Moreover, the court reasoned, the IDEA requires notice

prior to "removal of the child *from the public school.*" 20 U.S.C. § 1412(a)(10)(C)(iii)(I)

(emphasis added).  This language frames the requirement around an occurrence *at the public*

*school* (the removal) rather than an occurrence *at the private school* (the enrollment agreement).

<u>See</u> <u>Weast</u>, 111 F. Supp. 2d at 701.  And finally, the court noted that, as a practical matter, "[a]

parent fairly committed to private school . . . may still be disposed to reconsider."  <u>Id.</u>

The Court finds <u>Weast</u>'s reasoning persuasive.[4]  Here, Plaintiffs signed an enrollment

agreement with the Lab School in March.  A.R. 833.  At that time, A.D. was still attending

Creative Minds and retained the option to re-enroll for the following year until late April.  <u>See id.</u>

at 222 (notifying Plaintiffs that Creative Minds would be "giving up [A.D.'s] space" should she

not re-enroll by April 26).  From the perspective of Creative Minds, then, Plaintiffs' execution of

an enrollment agreement with the Lab School was a nonevent.

In any case, the Court need not resolve this dispute because it would overrule Creative

Minds' objection even under its preferred interpretation of removal.  As Creative Minds

concedes, tuition reimbursement cannot be denied on the basis of notice alone.  <u>See</u> <u>Schoenbach</u>

<u>v. District of Columbia</u>, 309 F. Supp. 2d 71, 85 (D.D.C. 2004).  While the IDEA provides that

the Court "*may*" reduce or deny tuition reimbursements if plaintiffs fail to provide proper notice,

---

[4] Creative Minds purports to find support for its construction of "removal" in the Third
Circuit case <u>W.D. v. Watchung Hills Reg'l High Sch. Bd. of Educ.</u>, 602 F. App'x 563, 567 n.3
(3d Cir. 2015) (unpublished), which, it says, held that removal under § 1412(a)(10)(C)(iii)(I)
includes signing an enrollment agreement.  But that case rendered no such holding.  Rather, the
court commented in a footnote that plaintiffs failed to satisfy the notice requirements under *any*
definition of removal because the child was "physically placed in [the private school]" less than
ten days after plaintiffs provided notice.  <u>Id.</u>

as a general rule, courts have upheld denials of reimbursement based on untimely notice only where it "contribute[d] to the inappropriateness of a child's educational plan." Id. at 86; see also, id. at 86 nn. 15–16 (collecting cases).

Penalizing parents *only* where their lack of notice contributed to the IEP's inadequacy is consistent with the purpose of the IDEA. The notice requirement, like the IDEA generally, exists (in part) to encourage parental participation in the child's education plan. See Burlington Sch. Comm. v. Massachusetts Dep't of Educ., 471 U.S. 359, 368 (1985) ("In several places, the [IDEA] emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness."). For this reason, the Third Circuit reversed a district court's complete denial of reimbursement where the parents acted "unreasonably" by being overly-demanding and unrealistic as to their child's IEP. See Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 86 (3d Cir. 1999). Such a ruling was improper, the Third Circuit reasoned, as it would run contrary to the goals of the IDEA "by placing parents at risk that their advocacy may be found extreme at the cost of full reimbursement." Id.

Here, Creative Minds argues that it would have fixed A.D.'s IEP had Plaintiffs provided notice prior to signing the enrollment agreement. See Objections 16–17. The record belies this contention. Plaintiffs began informing Creative Minds that they were considering moving A.D. to a private school as early as January—several weeks before signing the enrollment agreement and meeting with the IEP team. See A.R. 174–75, 426, 429–30. Several months prior to the IEP meeting and signing the enrollment agreement, Plaintiffs wrote an email to Creative Minds indicating their wish to "have kind of a team meeting to strategize how to assist [A.D.]," which "may include reevaluating [A.D.'s] IEP objectives." Id. at 122. The email specifically noted

that A.D.'s IEP goals had not been met and that Plaintiffs "d[id] not see the advancement in [A.D.'s] writing although her willingness to do it has changed considerably." Id.

While these emails do not constitute "notice" under the IDEA,[5] they nonetheless refute Creative Minds' claim that the school would have improved A.D.'s IEP had Plaintiffs simply notified them sooner. Further, the emails reveal that denying reimbursement here would run contrary to the goals of the IDEA: the record clearly reflects that Plaintiffs actively participated in A.D.'s education over the course of her time at Creative Minds. Plaintiffs flagged their concern with A.D.'s IEP prior to both their meeting with the IEP team and their signing of the Lab School enrollment contract. And Plaintiffs specifically cited a concern that A.D. wasn't progressing in writing before the IEP meeting in which Creative Minds reduced A.D.'s specialized instruction in that very area. Meanwhile, Plaintiffs notified Creative Minds that they were considering sending A.D. elsewhere as early as January. It cannot be said, then, that Plaintiffs contributed to the Creative Minds' failure to provide A.D. a FAPE. As such, they are entitled to full reimbursement.

    C.  <u>Objection III</u>

Finally, Creative Minds briefly argues that, under D.C. Mun. Regs. tit. 5-E, § 3019.9(e), any tuition reimbursement ordered as a result of this case is the responsibility of OSSE rather than Creative Minds. This argument fails. Creative Minds rests its argument entirely on § 3019.9(e), which provides: "tuition payments for District of Columbia children with disabilities placed in nonpublic schools are state level costs and are not the responsibility of the LEA

---

[5] To qualify as "notice" under the IDEA, the parents must inform the school that they intend to seek private education at public expense. See 20 U.S.C. § 1412 (a)(10)(C)(iii)(I). Plaintiffs did not inform Creative Minds that they retained their rights to seek public reimbursement until August 4.

Charter." <u>Id.</u> Creative Minds overlooks, however, that § 3019.9 is limited in scope to circumstances where "a child's placement is changed to a nonpublic school . . . by reason of a Hearing Officer Determination, Settlement Agreement, or a placement decision by the IEP Team at the LEA Charter." <u>Id.</u>  None of these scenarios describe the present case:  A.D. was transferred to a private school by the unilateral decision of Plaintiffs.  Therefore, § 3019.9(e) is inapplicable.

## <u>CONCLUSION</u>

For the reasons discussed, Creative Minds' objections to the Magistrate Judge's Report and Recommendation are overruled and the Report and Recommendation is adopted consistent with this Memorandum Opinion.  A separate order shall follow.

_____<br>
CHRISTOPHER R. COOPER<br>
United States District Judge

Date:  <u>September 28, 2020</u>